## John H. Jones, Trustee, for the Use of Jonathan R. LeValley, etc., v. John P. Jones et al.

1.  GAMBLING CONTRACTS—*Buying on Margins.*—In order to invalidate the contract for the delivery of property in the future, it must appear that neither party had the intention to deliver the property, and that both parties had the intention of settling the differences only.   But the intention of the parties in this regard may be established, not merely by their assertions, but by all of the attending circumstances of the transaction.   It makes no difference whether the real intention is formally expressed in words or not, if the facts and circumstances in proof show that it was the real understanding that there should be no actual purchase and no delivery or acceptance of the property involved in the contract, but merely an adjustment of damages upon differences.

Bill to Foreclose a Trust Deed.—Appeal from the Circuit Court of Jefferson County; the Hon. EDMUND D. YOUNGBLOOD, Judge presiding. Heard in this court at the February term, 1902.   Affirmed.   Opinion filed September 11, 1902.

On the 14th day of November, 1893, appellee John P. Jones and Gomer D. Jones, his son, executed their promissory note to appellant, Jonathan R. LeValley, for $1,600, payable one year after its date, with interest at six per cent.

On the same date, Gomer D. Jones executed a trust deed by which he conveyed to John H. Jones forty acres of land in Jefferson county, to secure the payment of the note. The deed was duly recorded. The claimed debt for which the note was given, arose out of transactions between appellant, LeValley, and John P. Jones, concerning the purchase and sale, or pretended purchase and sale, of grain by appellant, LeValley, on the board of trade of Chicago, on account of appellee John P. Jones.

Some years after the note and trust deed were made, Gomer D. Jones died intestate, unmarried and without issue, and appellees are his legal heirs.

This suit is a bill in chancery, brought by appellant against appellees, to foreclose the trust deed.

Appellees filed a verified plea to the bill, alleging that the note and trust deed were executed by Gomer D. Jones; that the note was executed by appellee John P. Jones, in settlement and for the purpose of securing the payment of a gambling debt then claimed to be due and owing by him to appellant, LeValley, a debt resulting from deals in "wheat options'" or "futures" made by and between the defendant, John P. Jones, and said Jonathan R. LeValley, in which no wheat was actually bought or sold, and none was intended to be bought or sold, such deals being in contravention of the statute in such case made and provided, and the said note and mortgage were not given "for any good or valuable consideration, and are by law null and void."

Appellees followed their plea with a cross-bill, setting up the due execution of the note and trust deed; the recording of the deed; that appellees are in possession of the land by appellee John P. Jones, agent for the other appellees; and further setting up the substantive matter of the plea, praying that on a final hearing, the note and trust deed be

decreed to be null and void, and that they be delivered up and canceled and the orator's title to the land be quieted and freed from the lien of the trust deed.

Appellant answered the cross-bill, denying its principal charges, and the cause was heard on the original bill; appellees' plea; the replication thereto; the cross-bill; answer to it; replication to answer; depositions of witnesses filed in the case; stipulations of the parties and oral evidence heard by the court; and the court dismissed the original bill and granted the relief prayed for in the cross-bill, and the case comes here on the appeal of the complainant in the original bill.

OTIS H. WALDO and NORMAN H. MOSS, attorneys for appellant.

ALBERT WATSON, attorney for appellees.

MR. PRESIDING JUSTICE BIGELOW delivered the opinion of the court.

Counsel for appellant, after stating the case as they understand it, say:

"The rulings of said Circuit Court which are particularly complained of by appellant, are as follows:

1st.    The Circuit Court permitted said John P. Jones to testify, over objection, what his intention or expectation was in the above transactions, and also as to what property or money or means he had.

2d.    The Circuit Court found that the dealings on the board of trade of the city of Chicago, out of which the indebtedness arose, were a form of gambling contracts prohibited by law.

3d.    The Circuit Court entered a decree dismissing the original bill for want of equity.

4th.    The Circuit Court entered a decree in accordance with the prayer of the cross-bill."

In these complaints counsel have stated all that is embraced in the latter seven of the nine errors assigned on the record, hence it will not be necessary to make special reference to them.

The first two errors assigned, question the rulings of the court in admitting on the hearing, improper, and refusing

to admit proper evidence, to which rulings appellant excepted, but since they are not referred to in appellant's brief and argument, we need not notice them, even if it should be conceded that exceptions to the rulings of the chancellor in admitting and excluding evidence in a chancery case tried by him without a jury can be assigned for error. The only questions then, to be determined, are questions of fact, viz., did appellant, at the time he made the claimed sales of grain to appellee John B. Jones, intend to deliver the grain to Jones or to his order, in the event that the price of grain advanced in the Chicago market, or did he expect and intend to settle with Jones by paying him in money the difference between the contract price of the grain, and the market price of it, at the time named for its delivery? And on the other hand, if the price of grain declined in the market, did appellee John P. Jones expect and intend to receive the grain and pay the contract price for it, or did he intend and expect to settle with appellee by paying him in money the difference between the contract price of the grain and the market price of it, at the agreed time of delivery?

Appellant has answered the first question in his testimony, according to his interest, as determined by events happening subsequent to the deals; and appellee John P. Jones has answered the second question in his testimony, according to his interest, as determined by events likewise happening subsequent to the deals, and it can not be said that the weight of the testimony of one as to his intention preponderates over that of the other; it therefore becomes necessary to determine from the other evidence in the case, what the real intention of the parties was in making the deals.

It appears from the undisputed evidence that appellee John P. Jones was a mason and contractor and that appellant, LeValley, was a commission broker on the board of trade in Chicago. That some time before the execution of the trust deed sought to be foreclosed in this case, Jones was engaged by LeValley to build him a house in Chicago,

and by this means they became acquainted and talked about the matter of speculating in grain on the board of trade. And it further appears that although Jones by trade was a mason and contracted to erect stone buildings, and had saved a little money at his trade, he was nevertheless visionary as to some matters disconnected with his trade, and to forward these matters he took counsel with LeValley as to making money by dealing on the board of trade, with which business he was not familiar. He put up money for margins and some of the first deals or pretended deals, apparently made for him a few small sums, which were paid to him by LeValley. His first deals seem to have been in corn, but afterward, and before the execution of the note and trust deed, the deals seem to have been in wheat only, and these purchases were in 5,000 to 10,000 bushel lots. He was frequently called upon by LeValley to put up margins, and he did so as long as his money lasted, and he even borrowed money for that purpose.

Jones was an old man, between seventy and eighty years of age, and was evidently unfit for doing business in buying and selling grain on the Chicago market, and because of the friendship and intimacy apparently existing between the two men, it seems incredible that LeValley did not know that Jones was not really purchasing any wheat, and had no money to pay for it with. To say, as LeValley does in his testimony, that he did not know that Jones' intentions were that the deals should be settled by the payment of differences in money, and he, LeValley, did not intend to close the deals in that way, taxed the credulity of the chancellor, who tried the case below, too strongly for him to accept such an explanation as satisfactory, that the deals were straight sales and purchases of grain, free from intent to disobey or evade the law.

If appellant actually purchased any wheat for Jones in the open market, it would seem that he would know from whom the purchases were made, and the same can be said of the sales, if any there really were; but the evidence gives no light on these points, notwithstanding appellant

was fully advised before the trial of the case, by appellees' pleadings, what their defense to appellant's bill was, and if there was any written evidence, showing from whom any purchases were made, or to whom any sales were made, it seems to us appellant would have produced it or given some reason for not doing so; but he did neither, and seems to have relied on the fact that he was a licensed broker on the board of trade, and that as the rules of that corporation prohibited the dealing in options, therefore his dealings with Jones were regular commercial transactions. Such a conclusion would preclude the idea that members of the board of trade could gamble on the prices of grain, notwithstanding appellant has proven by expert members of the board, that ninety to ninety-five per cent of the transactions on the board of trade are not settled by the delivery of the commodity dealt in. While we do not agree with the construction put upon this testimony by counsel for appellees, that ninety per cent of the deals on the board of trade are not enforceable under the laws of this state, for evidently the witnesses did not mean to be so understood, yet a fair inference from their testimony is, that many of the purported deals are not within the true spirit of the law, even if the forms of the law and of the rules of the board of trade have been complied with. We think it probable that appellant, in his dealings with Jones, came to believe he was within the rule of the law, not only in taking all of Jones' money, but also in getting security for $1,600, which he claims Jones owed him, as the result of lawful and businesslike transactions between them. So thought the appellants in the case of Jamieson et al. v. Wallace, 167 Ill. 388, which in principle is very like this case. The difference between that case and this is, in that case the appellee was a woman and the stuff claimed to have been purchased by Jamieson and his copartners, was gas and railroad stocks. Mrs. Wallace's capital was about $7,500. The stocks claimed to have been purchased for her amounted to $17,500. In this case Jones' capital is left uncertain by the evidence, but we glean from the evidence it might have been

$1,500. He was evidently a weak old man, when in the autumn of 1893 LeValley claims to have purchased for him 10,000 bushels of wheat for following May delivery at 71½ cents per bushel, and it is claimed by appellant that this wheat was sold by Jones' direction on March 28, 1894, at 61½ cents per bushel, yielding (including commissions) a net loss of $1,000 on the deal. This sum, with other like indebtedness, constitutes the sum secured by the trust deed.

In delivering the opinion of the court in the case of Jamieson et al. v. Wallace, *supra*, Mr. Justice Magruder said:

" In order to invalidate the contract, it must appear that neither party has the intention to deliver the property, and that both parties have the intention of settling the differences only. But the intention of the parties in this regard may be established, not merely by their assertions, but by all of the attending circumstances of the transaction. The question of intention is a question for the jury or for the court, to be determined by a consideration of all the evidence. The intention of the parties in such cases may be determined from the nature of the transaction, and from the manner and method of carrying on the business."

The court cites many authorities in support of its view of the matter, which need not be repeated here. The court further says:

" Among these circumstances, besides the mode of dealing between the parties, is the pecuniary ability of the party purchasing. If the purchases of a party as ordered through a broker, are larger in amount than he is able to pay for, it is a strong circumstance indicating that there was no intention of receiving the property, but rather an intention to settle the difference between the market price and the contract price. Such intention may be also inferred where the party making the purchase never calls upon the party ordering the purchase for the purchase money, but only for margins. It makes no difference whether the real intention is formally expressed in words or not, if the facts and circumstances in proof show that it was the real understanding that there should be no actual purchase and no delivery or acceptance of the property involved in the contract, but merely an adjustment of damages upon differences."

There were a number of deals between appellant and Jones, and in no instance was there any actual delivery of the grain supposed to have been purchased by him, nor did he call for any delivery; but, on the other hand, there was no lack of calls by appellant for margins, and Jones seems to have paid them until his money was exhausted, but one call too many was made. About the time of the last claimed purchase of wheat, appellant sent one Baldwin, his bookkeeper, to Jones' residence for margins in money or security, and not finding Jones at home, Baldwin made known his business to a daughter of Jones, and her testimony of the interview is as follows:

"Mr. Baldwin called at our house, No. 254 West Congress street, and asked for my father. I told him that he was not at home. He said that Mr. LeValley must have some money or security on account of the wheat bought for my father. I told him that he could not get it, as we had none to give; that my father did not know anything about wheat and that they ought to be ashamed to take advantage of an old man, and he said that was just what they were looking for—'suckers.'"

Baldwin's testimony was not taken, nor did appellant put his books in evidence.

We are of the opinion that the decrees dismissing the original bill and granting the relief prayed for in the cross-bill are right, and they are affirmed.

A motion was made by appellees to dismiss the original bill, because the transcript of the record is not made in compliance with the rules of the court, which was taken with the case.

The motion is not without merit, but inasmuch as the clerk of the court below may not have known how to make up a record of the peculiar character of this one, and was not specially instructed by appellant's counsel as to the order in which the record should be transcribed, and as a ruling on the motion can not now benefit or injure either party, it is overruled.